522 A.2d 52

Nancy L. WENRICK, Administratrix of the Estate of
Harold Wenrick, Deceased,

v.

SCHLOEMANN–SIEMAG AKTIENGESELLSCHAFT and
Eaton Corporation, Successor-In-Interest by Merger to
Cutler-Hammer, Inc.

Appeal of EATON CORPORATION Successor-In-Interest by
Merger to Cutler-Hammer, Inc.

Nancy L. WENRICK, Administratrix of the Estate of Harold
Wenrick, Deceased, Appellant,

v.

SCHLOEMANN–SIEMAG AKTIENGESELLSCHAFT and
Eaton Corporation, Successor-In-Interest by Merger to
Cutler-Hammer, Inc.

Superior Court of Pennsylvania.

Argued March 6, 1986.

Filed Jan. 7, 1987.

Reargument Denied March 20, 1987.

138

Francis J. Deasey and James L. McKenna, Philadelphia, for Eaton, appellant in No. 1533 and appellee in No. 1668.

Robert M. Britton and William F. Sullivan, Philadelphia, for Wenrick, appellant in No. 1668 and appellee in No. 1533.

Robert F. Harchut, Philadelphia, for Schloemann-Siemag, appellee.

Before CAVANAUGH, BECK and JOHNSON, JJ.

BECK, Judge:

Harold Wenrick was crushed to death by a component of a large extrusion press which was activated when a fellow worker accidentally tripped the unguarded lever of an electrical limit switch. His widow, Plaintiff Nancy L. Wenrick, brought this action as administratrix of her late husband's estate and on behalf of herself and her children against Eaton Corporation ("Eaton"), corporate successor of Cutler-Hammer, Inc., the supplier and designer of the electrical control system of the press, and Schloemann-Siemag Aktiengesellschaft and Schloemann-Siemag, Inc. ("SMS"), corporate successor of Feller Engineering Co., the manufacturers and designers of the press. Prior to trial, Plaintiff's case against SMS was settled for $200,000.

The case came to trial before the Honorable Charles A. Lord of the Court of Common Pleas of Philadelphia County. At the conclusion of the Plaintiff's case, counsel for Eaton orally moved for a compulsory nonsuit on the three counts pending against Eaton: strict liability, breach of warranty and negligence. Before the trial court had an opportunity to rule on the motion, Plaintiff's counsel withdrew the breach of warranty claim. Thereafter, the trial court denied the motion for compulsory nonsuit.

At the conclusion of the trial on March 6, 1984, the case was submitted to the jury on special interrogatories. In its answers, the jury found both that the press and the electrical control systems were defective and that the defective conditions were substantial factors in causing Plaintiff's losses. In addition, the jury also answered interrogatories on a negligence theory with findings that both SMS and Eaton were negligent: SMS in failing to place a guard on the limit switch after the press was delivered to Plaintiff's employer, and Eaton in failing to warn SMS of the unguarded limit switch. With reference to the findings of negligence, the jury also answered special interrogatories with findings that SMS was 65% negligent and Eaton was 35% negligent. Finally, the jury found that Mr. Wenrick was not contributorily negligent.

The jury then awarded damages to Mrs. Wenrick in the amount of $1,500,000 under the Wrongful Death Act and $25,000 under the Survival Act. This recovery, coupled with the addition by stipulation of $3,222 in funeral expenses, amounted to a total verdict of $1,528,322.

Eaton filed timely post-trial motions, including a motion for judgment n.o.v. On May 20, 1985 a three-judge court *en banc*, consisting of Judge Lord, the Honorable Joseph P. Braig and the Honorable Lawrence Prattis, denied Eaton's post-trial motions and entered judgment against Eaton only in the amount of $764,161. The amount of this judgment did not include any damages for delay pursuant to Pa.R. C.P. 238.

Both Eaton and the Plaintiff appealed from the May 20, 1985 Order. On June 12, 1985 the trial court amended its May 20, 1985 Order to add delay damages, thereby increasing the judgment by $287,916.60, for a total judgment of $1,052,077.60.

Eaton, Appellant at No. 1533 Philadelphia, 1985, first argues on appeal that the trial court was deprived of jurisdiction when Eaton attempted to have the case removed to federal court. Eaton also contends that the trial court committed reversible error by admitting expert testimony on the ultimate issue, by refusing to grant a compulsory non-suit and thereafter judgment n.o.v. as to both the strict liability and negligence counts, by improperly charging the jury and in submitting the claims against Eaton to the jury. Apparently, Plaintiff is not pursuing her cross-appeal filed at No. 1668 Philadelphia, 1985 because the trial court added delay damages subsequent to the filing of the cross-appeal.

We reverse the trial court's denial of Eaton's Motion for Judgment N.O.V. as to both the strict liability and negligence counts because we find that Eaton was not responsible for the creation of the defect that resulted in Mr. Wenrick's death.

Initially, however, we will address the fundamental question of jurisdiction that Eaton has raised.

## I. JURISDICTION

█ On March 6, 1984, just prior to closing arguments in the trial of this case, appellant notified the trial court and appellees that it had petitioned the Federal District Court for the Eastern District of Pennsylvania for removal of the case to that court. Normally, the filing of such a petition imposes an automatic stay on any further proceedings in the state court and any proceedings that are conducted in the state court are a nullity until there has been a remand by the federal court. *Fischman v. Fischman*, 470 F.Supp. 980 (E.D.Pa.1979); 28 U.S.C. § 1446(e). In other words, this federal removal provision has the effect of a statutory stay of further state proceedings. *Vendetti v. Schuster*, 242 F.Supp. 746, 751 (W.D.Pa.1965).

█ In response to appellant-Eaton's removal petition, appellee-Wenrick filed a motion in the District Court requesting, *inter alia*, that the court declare the petition void *ab initio* since Eaton had not secured the consent of the co-defendant, SMS, to the removal. With two limited exceptions not applicable to this case, all defendants must join in or consent to removal. *Chicago, Rock Island & Pacific Ry. v. Martin*, 178 U.S. 245, 20 S.Ct. 854, 44 L.Ed. 1055 (1900).

█ In a Memorandum Opinion and Order dated April 16, 1984, Judge VanArtsdalen of the District Court rejected Eaton's removal petition and remanded the case for further proceedings in the state court. The reason for the rejection of the petition was the failure of appellant to secure SMS's consent. However, the District Court expressly refused to rule on appellee's request that the removal petition be declared void *ab initio*, noting that

> [b]ecause no party sought to have the state court proceedings enjoined, and because this court must remand this action for lack of jurisdiction, the question of the effect of removal on the state court proceedings is not properly before this court. That issue is a matter to be determined in the state proceedings on remand.

Memorandum Opinion and Order of VanArtsdalen, J., *Wenrick v. SMS AG,* No. 84–1121 (E.D.Pa. April 16, 1984). (R. 1215a n. 2).

Eaton strenuously argues that the removal statute rendered all proceedings in this case in the state court after the filing of the removal petition void. However, Eaton cites no precedent from any federal court sitting in Pennsylvania to support this proposition. The only case that Eaton does cite from such a court is *Fischman v. Fischman, supra,* but that case presented only the question of the effect of a *valid* removal on subsequent state court proceedings. It did not present the question raised in this case, namely the effect on state court proceedings of an attempted removal that lacked the necessary jurisdictional requisites. Judge VanArtsdalen specifically held that Eaton's attempted removal was improvident and without jurisdiction. Memorandum Opinion and Order, *supra.* (R. 1215a).

We agree with the conclusion of the en banc trial court that the procedure followed by the trial judge in this matter, i.e. continuation of the trial after attempted removal, was proper. In at least two cases, the Supreme Court has indicated that where the attempted removal is invalid, the state court proceedings conducted after the attempted removal may be valid. *See Metropolitan Casualty Ins. Co. v. Stevens,* 312 U.S. 563, 61 S.Ct. 715, 85 L.Ed. 1044 (1941); *Yankaus v. Feltenstein,* 244 U.S. 127, 37 S.Ct. 567, 61 L.Ed. 1036 (1917). *See and compare Crown Construction Co. v. Newfoundland American Insurance Co., Ltd.,* 429 Pa. 119, 239 A.2d 452 (1968) (requiring strict compliance with removal statute before jurisdiction of state court will be ousted).

In deciding that the trial court acted properly in bringing the trial of this case to a conclusion despite the filing of the removal petition, we are also influenced by the particular scenario presented by this case. In this regard, we find it noteworthy that despite its argument that the state court proceedings post-removal were void, Eaton itself fully participated in those proceedings until the end of the trial.

Moreover, as Judge VanArtsdalen noted, Eaton did not at any time seek to have those proceedings enjoined by the federal court. Finally, because of the improvident timing of the attempted removal immediately prior to closing arguments in this lengthy trial, a decision that the later state court proceedings were void would have the absurd and impractical result of voiding the entire trial. The state court, therefore, was clearly acting within its power in completing the trial after the invalid removal attempt.

## II. STRICT LIABILITY: NEGLIGENCE

This accident occurred because one of Mr. Wenrick's fellow workers accidentally tripped an unguarded limit switch which in turn caused the billet loader of the press to activate. Mr. Wenrick was standing in the path of the billet loader, assisting in making repairs to the press. The press had not been deactivated prior to repair, as it should have been, and Mr. Wenrick was crushed to death.

Of central importance to the legal analysis in this case is the definition of the product and the defect in the product which gave rise to both plaintiff's strict liability and negligence theories. Once the product and the defect therein are defined, it becomes clear that SMS, not Eaton, was responsible for the defect and, thus, for Mr. Wenrick's death.

The defective product in this case is the press as a whole and the defect in that product is an unguarded limit switch positioned by a staircase where the switch could easily be inadvertently tripped as it tragically was. In fact, both parties' briefs describe the defect in precisely this dual manner—an unguarded switch abutting a staircase. Brief for Appellant at p. 26; Brief for Appellee at p. 48. Further, it was this dual defect that caused this accident. As Wenrick states in her brief, "[i]t was the conjunction of the unguarded limit switch in an unguarded condition and its being mounted on the press next to an entrance-way where it was likely to be tripped that combined to cause Mr. Wenrick's death." Brief for Appellee at p. 48.

The record is relatively clear as to the roles Eaton and SMS variously played in the manufacture of the press. Eaton apparently designed and definitely manufactured the electrical system to power the press but its design and manufacture did not include the limit switch or its positioning. It based its design on sequence of operation diagrams and similar specifications SMS provided to Eaton. Eaton did not install the electrical system, but sub-contracted the actual wiring operation. Eaton did visit the location of the press after installation to debug and adjust the electrical system at various times during its initial six months of operation. (R. 860a). Eaton's electrical system design did not include a direction as to the exact location of the limit switch nor, obviously, did it include any direction as to the placement of the staircase which formed a part of the press itself. Eaton did not manufacture or supply any of the limit switches to be used on the press.

On the other hand, SMS designed, manufactured and installed the press. SMS obtained the unguarded limit switch from a third party and installed it. SMS, not Eaton, designed and built the portion of the press where the switch was, and determined exactly where the switch would be, designed the pit beneath the press and located the steps leading to the pit directly adjacent to the switch. (R. 661a–64a).

We note that in reviewing the record to ascertain these facts, we have remained fully conscious that, as this court has recently stated,

> ... on appeal from the refusal of the lower court to enter judgment n.o.v., the sole duty of the appellate court is to decide whether there was sufficient evidence to sustain the verdict, granting the verdict winner every favorable inference reasonably to be drawn from the evidence and rejecting all unfavorable testimony and influences [sic].

*Walasavage v. Marinelli,* 334 Pa.Super. 396, 407, 483 A.2d 509, 514–15 (1984).

As to many of the facts recited above, there was no real dispute between the parties. For example, there is no

evidence of record indicating that Eaton played any role in manufacturing, supplying, selling or installing the switch on the press. Wenrick's own expert not only testified to all these facts, but also testified that SMS, not Eaton, located the switch on the press. (R. 661a–65a). In fact, Wenrick's own Brief fails to cite to any place in the record where any definite evidence was adduced to show that Eaton was responsible for the choice of the switch, the installation thereof without a guard or the positioning of either the switch or the staircase.

Wenrick's Brief states that because Eaton participated in the "design", it "necessarily" had to have participated in the "positioning and obligation to guard that switch." Brief for Appellee at p. 48. Wenrick provides no record reference to support this "necessary" conclusion. The only true support Wenrick provides for its contention that Eaton positioned the switch is the assertion that Eaton provided the drawings that indicated where the *wires* had to be placed to wire the limit switches. To support this assertion, Wenrick refers to a portion of the testimony of Eaton's project engineer assigned to this project. However, Wenrick's reference to that testimony is misleadingly selective, since the engineer specifically testified that although Eaton did the drawings showing wire placement, those drawings did *not* indicate where any of the limit switches themselves were to be located. (R. 866a). The same witness also expressly testified that SMS determined where the limit switches were to be located on the press. (R. 860a). And as previously indicated, Wenrick's own expert testified that SMS, not Eaton, positioned the switch by the staircase.

■ Having thus clarified what the evidence reveals as to the respective roles of Eaton and SMS in the manufacture of the true product involved here, i.e. the press, the responsibility for the defect in that product becomes clear. Eaton is the designer and manufacturer of a component part of the product. The component for which Eaton is responsible is the electrical system. Our Supreme Court has held that a component part manufacturer can indeed be held strictly

liable when the part it manufactured is defective and causes injury, so long as the component part was not substantially changed after it left the hands of the manufacturer. *Burbage v. Boiler Engineering & Supply Co., Inc.,* 433 Pa. 319, 325, 249 A.2d 563, 566 (1969). *See also Orion Insurance Co. v. United Technologies Corp.,* 502 F.Supp. 173, 178 (E.D.Pa.1980). Liability does not automatically shift to the party who assembles the part into the final product unless in so doing that party substantially changes the part and thereby renders it defective. *Id.* Our Supreme Court has also recognized that the lack of proper safety devices can constitute a defective design for which recovery under 402a can be had. *Bartkewich v. Billinger,* 432 Pa. 351, 354, 247 A.2d 603, 605 (1968).

■ In this case, there was no evidence that the component part that Eaton designed and manufactured, i.e. the electrical wiring system, was defective when it left Eaton's hands. There is no contention that the system malfunctioned. There is only the contention that the aspect of the design and assembly of the press which placed an unguarded switch next to a staircase was defective. Eaton itself did not participate in that design or assembly.

Although it is the function of the jury to determine if a defect in a product exists, they may only "find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Azzarello v. Black Brothers,* 480 Pa. 547, 559, 391 A.2d 1020, 1027 (1978). The electrical system itself did not leave Eaton's control in a defective condition in either of the aforementioned ways. In fact, it was not even rendered defective when incorporated into the press, since the unguarded switch and the staircase were never part of Eaton's system. They were parts of the press as a whole, for which SMS is responsible.

Eaton's lack of responsibility in this case can perhaps best be illustrated by a comparison to another case in which

Eaton's corporate predecessor, Cutler-Hammer, Inc. ("CH"), was properly held liable for the defective design of an electrical control system it provided to Vernon Allsteel ("VA") for installation in a press VA manufactured. *Burnett v. Mackworth G. Rees, Inc.*, 109 Mich.App. 547, 311 N.W.2d 417 (1981). In that case, a woman's hand was crushed when a control button fell off the press when she was operating it. The button itself had been manufactured by Mackworth G. Rees, Inc. ("Rees") and purchased by CH who directed where it was to be placed on the press. VA installed the control button. The court upheld a jury verdict against CH and VA and absolved Rees of liability, stating that Rees had merely supplied a non-defective off-the-shelf button. In contrast, CH had designed the circuitry to be used in the control button and it was that circuitry that proved to be defective. *Id.* at 549–559, 311 N.W.2d at 418–22.

The contrast between *Burnett* and this case is clear. In *Burnett*, CH's (Eaton's) electrical control system had a defective circuitry design and CH had ordered and provided to VA the control button. Here, Eaton's system had no such defect and Eaton did not provide or locate the switch.

The remaining question is whether Eaton is liable in negligence. Eaton's liability in negligence can either be premised on its alleged negligent production of a defectively designed product or on its failure to warn SMS of the danger presented by the limit switch as it was positioned after the press was operational. Given the foregoing analysis of the strict liability aspect of this case, Eaton is just as clearly not liable for the negligent production of a defective product. Since Eaton's product was not defectively designed, it is not liable under either Section 402A or negligence principles.

 However, it is clear from a reading of the pleadings and record that Wenrick's true focus in its negligence claim is the failure of Eaton to warn *SMS*, *after* the press

was in operation, of the defect in the press resulting from the positioning and unguarded condition of the switch.[1] Admittedly, Wenrick did not clarify this aspect of its negligence theory until after the close of evidence during a conference with the trial judge concerning the charge to the jury. Nevertheless, at that time an exchange between counsel and the trial judge took place in which counsel for Wenrick indicated that the legal basis for this allegation of negligence was Section 324A of the Restatement (Second) of Torts. (R. 903a–12a).

Section 324a states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

1. This failure to warn theory is to be distinguished from an allegation that Eaton's product was defective because it left Eaton's hands with inadequate warnings as to the dangers presented by the product. In *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975), the Supreme Court expressly stated that a product defect is not limited to a design or manufacture defect. The defect can be the lack of adequate warnings or instructions. *Id.*, 462 Pa. at 100, 337 A.2d at 902. Although Wenrick appears not to have seriously contended that Eaton's product had an inadequate warnings defect at the time of delivery to SMS, we note that any such contention would be meritless. A component part manufacturer should not be burdened with the heavy duty of inquiring into every possible use of their part and warning of every possible danger that might be associated with the integration of their part into the completed product. *Frazier v. Materials Transportation Co.*, 609 F.Supp. 933 (W.D.Pa.1985). This is particularly true here, where SMS itself was an experienced press manufacturer and had sole responsibility for the placement of the switch and staircase. Any design or lack of warnings defects in this case are chargeable to SMS who was responsible for the ultimate design and construction of the press. It was both more practical for and more within the expertise of SMS to incorporate safety devices on the switch and/or to warn of the danger that the unguarded switch presented. *Frazier, supra; Verge v. Ford Motor Co.*, 581 F.2d 384, 387–89 (3d Cir.1978); *Taylor v. Paul O. Abbe, Inc.*, 516 F.2d 145 (3d Cir.1975); *Lesnefsky v. Fischer & Porter Co., Inc.*, 527 F.Supp. 951, 956 (E.D.Pa.1981). Eaton certainly had no duty to put a warning on its electrical system regarding the danger that might be presented if an unguarded switch next to a staircase was placed on the press itself.

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts 324A (1965). Counsel for Wenrick also cited to *Blessing v. United States*, 447 F.Supp. 1160 (E.D.Pa.1978) in support of this allegation of negligence. *Blessing* concerned a negligence claim by an injured press operator against the Occupational Safety and Health Administration. Plaintiff alleged that because OSHA had conducted inspections at his employer's plant, and allegedly had negligently failed to detect the defect in the press that caused plaintiff's injury, OSHA was liable to plaintiff. This theory was put forth, at least in part, under Section 324A. Wenrick apparently attempted to fit within the same theory of negligent inspections in this case.

When counsel presented this theory to the trial judge, the judge expressed his doubts as to whether there was any indication in the evidence that Eaton ever undertook to or did inspect the limit switch. Nevertheless, the trial judge stated that Section 324A did appear to set forth the only legal basis for Wenrick's claim of negligence after the press was operational. Eaton's counsel duly excepted. (R. 907a–12a).

The trial judge concluded that he "intended to charge negligence in their failure to warn Schloemann [SMS], whether it resulted from the inspection or from their alleged duty as a designer." (R. 911a). In fact, the court's rather brief charge to the jury did not make any reference to the specific requirements of Section 324A. The charge was merely a general statement of the law of negligence, although as to Eaton's negligence the charge did focus entirely on Eaton's failure to warn SMS, not Wenrick or his employer, of the danger presented by the switch. The only possible legal support for the imposition of liability on Eaton to *Wenrick* as a result of Eaton's breach of its

alleged duty to warn *SMS* after the press was operational is Section 324A, which addresses precisely such a three-party situation.

However, as the trial judge made clear at the time Wenrick's counsel first advanced the Section 324A argument, the record is completely devoid of evidence to show that Eaton ever undertook to inspect the limit switch or any other part of the press, or that Eaton did in fact inspect the switch itself, or that SMS or Wenrick was relying on Eaton to so inspect or that Eaton's failure to inspect it in any way increased the risk of harm to anyone resulting from the switch. In fact, the record contains only testimony to the contrary.

For example, although Eaton's project engineer did testify that he was at the press' location after assembly to debug and adjust the electrical system and saw the unguarded limit switch at that time [2] (R. 860a–62a, 882a–83a), he also testified that it was not Eaton's responsibility to warn SMS of any danger presented by the switch. (R. 883a–84a). Moreover, the engineer testified that SMS had never consulted Eaton as to the press itself or the position of the switches. (R. 863a).

The only testimony to the contrary is that of Wenrick's expert, who stated that is his opinion Eaton had a "duty" to warn SMS (R. 624a). From what this supposed duty arose is not indicated.

[8] This evidence cannot conceivably be construed as supporting Eaton's liability under Section 324A. Wenrick did not even meet the minimal requirements of alleging and proving an undertaking by Eaton, a failure to fulfill that undertaking or any causal connection between that alleged failure and Wenrick's death. *See Evans v. Liberty Mutual Insur. Co.*, 398 F.2d 665 (3d Cir.1968); *Isaacson v. Mobil Propane Corp.*, 315 Pa.Super. 42, 461 A.2d 625 (1983). In consequence, the Section 324A claim obviously must fail.

2. Interestingly, the engineer also testified that he had no recollection of the staircase to the pit being located adjacent to the switch at the time he was at the press location. (R. 880a).

The Order of May 20, 1985 is reversed and the case is remanded for entry of judgment N.O.V. in favor of Eaton.[3]

---

**3.** Because we direct that Eaton is entitled to judgment N.O.V., we need not address any of Eaton's remaining allegations of error.