564 A.2d 1244

Nancy L. WENRICK, Administratrix of the Estate of Harold Wenrick, Deceased, Appellant,

v.

SCHLOEMANN–SIEMAG AKTIENGESELLSCHAFT and Eaton Corporation, Successor-in-interest by merger to Cutler–Hammer, Inc., Appellees.

Supreme Court of Pennsylvania.

Argued Dec. 8, 1988.

Decided Oct. 16, 1989.

Robert M. Britton and William F. Sullivan, Jr., Philadelphia, for appellant.

Francis J. Deasey and James L. McKenna, Philadelphia, for Eaton Corp.

Charles C. Hileman, Philadelphia, for Scholemann–Seimag Aktiengesellschaft.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

ZAPPALA, Justice.

This appeal presents a single issue: whether Superior Court exceeded the scope of its review when it reversed the trial court and directed entry of judgment n.o.v. in favor of Eaton Corporation. 361 Pa.Super. 137, 522 A.2d 52.

Harold Wenrick, a mechanic first class employed by Cerro Metal Products Company in Bellefonte, Pennsylvania, was killed while he was engaged in repairing an extrusion press at the Cerro plant. The press operates by taking large cylinders of heated brass, called billets, and pushing them through a container, forcing the malleable brass through openings of various dimensions. The tubes or rods that are produced are then used in the manufacture of brass products. A hydraulic loader lifts the billets into position to be forced through the press. The billet loader must then retract to permit passage of the ram, which pushes the billet through the container. On the day of the fatal accident, Harold Wenrick was standing beneath the billet loader, which was in its fully extended position, and was crushed when the loader retracted.

Nancy Wenrick brought this action, as administratrix of her husband's estate and on behalf of herself and her children, against Schloemann–Siemag Aktiengesellschaft (SMS AG), the manufacturer and designer of the press, Schloemann–Siemag, Inc. (SMS Inc.), the corporate succes-

sor to Feller Engineering Co., which had been SMS AG's representative in the United States when the press was ordered and constructed, and Eaton Corporation, successor to Cutler–Hammer, Inc., the supplier and designer of the electrical control system of the press.

The action was framed in three counts—strict liability, negligence, and breach of warranty. Prior to trial, the plaintiff negotiated a settlement with SMS AG and SMS, Inc., and executed a joint tortfeasor release as to them. These parties remained in the case, however, and litigated several issues, including their comparative liability, the decedent's contributory negligence, the amount of damages, and the additional claims by and against Eaton. After all the evidence had been received, by agreement of all parties a directed verdict was ordered dismissing SMS, Inc. The plaintiff also withdrew the breach of warranty claim. The jury's verdict was against both SMS AG and Eaton on the two remaining counts; in the negligence count, the jury assigned 65% of the liability to SMS AG and 35% to Eaton.

Eaton filed post-trial motions, including a motion for judgment n.o.v., which were denied by the trial court sitting en banc. On appeal, Superior Court reversed the order denying Eaton judgment n.o.v., as to both the strict liability and the negligence counts, and remanded for entry of such judgment in Eaton's favor.

It is agreed that the proper scope of review for an appellate court examining a denial of judgment n.o.v., according to the longstanding rule, is whether, reading the record in light most favorable to the verdict winner and granting him the benefit of every favorable inference, there is sufficient competent evidence to support the verdict. Wenrick asserts that the Superior Court, though acknowledging this rule, exceeded its authority under this standard and ignored evidence that supported the verdict, relying instead on evidence that supported the defendant's position.

Though no direct evidence was presented as to why the billet loader retracted, circumstantial evidence, based on

which mechanisms had the capacity to cause the retraction and where people were located at the time of the accident, supported the plaintiff's theory that a switch, normally tripped by the ram when it reached a certain point in its progress, was inadvertently triggered by a workman descending a pair of steps into the service pit beneath the press. The plaintiff's expert testified that the switch was a part of the electrical control system for the press designed by Cutler–Hammer. It was his opinion that the absence of a guard to cover the actuating part of the switch "was a defect in design and manufacture as installed and as used." He also testified that, in his opinion, in accordance with accepted engineering practice Cutler–Hammer had a duty to warn SMS AG about the danger posed by the location of the unguarded switch above the steps.

Wenrick argues in this appeal that the evidence adduced at trial and inferences that may be drawn from that evidence support the conclusions that the electrical control system design supplied by Cutler–Hammer was defective, and that Cutler–Hammer ought to have warned of the danger, in the manner suggested by her expert witness. Superior Court, she argues, exceeded its reviewing authority in holding otherwise. .

■ After carefully scrutinizing the entire record, we agree with the Superior Court that the plaintiff's evidence does not support the conclusion that the electrical control system designed by Cutler–Hammer was defective. The defect, as identified by the plaintiff's own expert witness, both on direct examination and on cross-examination, was "the unguarded condition of the switch *and the proximate location of the switch relative to the steps.*" R. 665a (emphasis added). The evidence, however, was uncontradicted, even by plaintiff's expert, that all of the considerations that went into where the switch would be located were determinations made by SMS AG. Wenrick argues that because Cutler–Hammer, using sequence diagrams and descriptions supplied by SMS AG, participated in the design of the press, it necessarily must have been involved in position-

ing the switch, and thus be responsible for the defect arising out of its dangerous placement. Based on the evidence in the record, we do not find this inference reasonable, much less necessary.

The plaintiff's expert formed his opinion that Cutler–Hammer's design had included placement of the switch by examining wiring diagrams. There is no evidence, however, that these diagrams, or any of the sequence diagrams from SMS AG to Cutler–Hammer, contained any indication of the dimensions or layout of the completed press as it would be installed. Indeed, the only evidence on point is that none of this information was necessary to the design of the electrical control system. Specifically, there is no evidence that Cutler–Hammer, in designing the electrical control system, had any indication of the placement of the service pit located under the press or of the steps into the pit. Since, as the plaintiff's expert testified, the defect consisted of an unguarded switch located above these access steps, and since the placement of the pit, the steps, the rails on which the switch was located, and the switch itself were all decisions made by SMS AG in manufacturing the press, and none were dictated by the electrical design supplied by Cutler–Hammer, the evidence is not sufficient to sustain the strict liability claim against Eaton, Cutler–Hammer's successor.

The remaining question is whether Superior Court erred in directing judgment n.o.v. in favor of Eaton on the negligence count. The plaintiff's theory of negligence was that Cutler–Hammer had a duty, which it breached, to warn of the danger presented by the placement of the unguarded switch above the steps where it could be inadvertently triggered.

After the press had been installed at the Cerro site, Cutler–Hammer personnel were present, along with representatives from SMS AG, for the start-up and "debugging" of the press. During this period the machine builder and the control manufacturer, through test actions, discover and correct any problems in the machine's operation. Cutler–

Hammer's project engineer testified that the biggest problem addressed during the debugging was adjusting the speed of the mechanism that coiled the brass rod or tube as it was being extruded from the press. Although most of this engineer's work took place "in the back room" where the "brains" of the electrical control system was located, he did observe the machine from the nearby console panel. It may be inferred, therefore, that he saw the switch in question, where it was located, and that it was unguarded. Notably, he also testified that he did not recall there being steps at that location.

The plaintiff's expert witness testified that in his opinion Cutler–Hammer had a responsibility to notify SMS AG of the hazard presented by the unguarded switch above the steps. His answer was given on direct examination in response to a question whether Cutler–Hammer, "in accordance with accepted engineering practice," had a duty to warn SMS AG regarding the danger. However, when asked why Cutler–Hammer had this responsibility, the expert offered only that Cutler–Hammer was very knowledgeable of engineering design practices and of governmental safety regulations, and was well experienced in the arts and crafts of engineering design. According to the witness, "[w]ith all of these factors, any competent engineering person knows by immediately looking at the construction of the press" the danger of the unguarded switch placed above the steps, and "knowing this, they had a defined responsibility. . . ." An objection was sustained as to the reference to the extent of Cutler–Hammer's knowledge, but the witness continued on to state that "for all those reasons Cutler–Hammer had a responsibility to notify" SMS AG of the hazard.

At trial, Wenrick relied substantially on Restatement (Second) of Torts, Section 324A, as setting out the legal basis for liability in these circumstances. That section states

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as

necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Our examination of the record reveals not the slightest bit of evidence that Cutler–Hammer conducted a safety inspection of the press or any of its components or undertook the task of performing such an inspection. Likewise there is no evidence that SMS AG, much less Cerro and its employee Wenrick, relied on Cutler–Hammer to perform such an inspection. The facts simply do not demonstrate the elements necessary to subject a defendant to liability under Section 324A, and the appellant concedes as much in her brief. It is argued, however, that the issue of "ordinary negligence" was properly submitted to and determined by the jury, and that the lower court erred in rejecting the jury's decision.

■ Before a person may be subject to liability for failing to act in a given situation, it must be established that the person has a duty to act; if no care is due, it is meaningless to assert that a person failed to act with due care. Certain relations between parties may give rise to such a duty. Although each person may be said to have a relationship with the world at large that creates a duty to act where *his own* conduct places others in peril, Anglo–American common law has for centuries accepted the fundamental premise that mere knowledge of a dangerous situation, even by one who has the ability to intervene, is not sufficient to create a duty to act.

Wenrick asserts that Cutler–Hammer's duty to warn SMS AG arose from its "substantial participation in the installa-

tion of the press . . . its status as the designer of the entire electrical control system and the facts that the unguarded condition of the switch and its location above the access steps was obvious." As noted in the discussion of the strict liability claim, however, Cutler–Hammer's task in designing the electrical control system did not include the physical placement of any mechanisms on the manufactured product. All the decisions and actions whereby the danger was created—the type of switch (unguarded), its location, and the location of the service pit and its access steps—were the responsibility of SMS AG. The appellant's expert's opinion as to duty, and the appellant's argument on this appeal, amount to no more than an assertion that knowledge of a potential danger created by the acts of others gives rise to a duty to abate the danger. We are not prepared to accept such a radical restructuring of social obligations.

The order of the Superior Court is affirmed.

NIX, C.J. and STOUT, former Justice, did not participate in the decision of this case.

LARSEN, J., files a dissenting opinion in which PAPADAKOS, J., joins.

LARSEN, Justice, dissenting.

I dissent. It is clear that the majority of this Court has exceeded the scope of its review by affirming Superior Court's order remanding for the entry of judgment n.o.v. in favor of appellee Eaton Corporation.

In *Tonkovic v. State Farm Mutual Automobile Insurance Co.*, 513 Pa. 445, 455, 521 A.2d 920, 925 (1987), this Court stated that:

In our review of the denial of a motion for judgment n.o.v., or a new trial, we will reverse the trial court only when we find an abuse of discretion or an error of law which controlled the outcome of the case. In passing on the question, we must view the evidence and all reasonable inferences therefrom in the light most favorable to Appellant, the verdict winner. *Evidence supporting the*

*verdict is considered and the rest is rejected.* Conflicts in testimony are resolved in favor of the verdict winner. (emphasis added) (citations omitted).

The majority of this Court fails to reject evidence that does not support the verdict herein, and indeed, bolsters its argument with testimony presented by appellee Eaton Corporation. For example, where the majority notes that the dimensions and layout of the extrusion press were unnecessary to the design of the electrical control system for which appellee Eaton Corporation's predecessor-in-interest was responsible, maj. op. at 1247, it is adopting the testimony of Eaton witness Donald Mattia almost verbatim. *See* Notes of Testimony (N.T.) at 773 (Mar. 5, 1984). Moreover, the majority gives undue emphasis to the fact that it was the proximate location of the limit switch which was responsible for the tragic accident that occurred herein. Maj. op. at 1246. Although it is true that appellee Schloemann–Siemag Aktiengesellschaft was responsible for the placement of the switch on the rail, the location of the rail, and the design of the steps leading to the pit, even the majority concedes that the *unguarded condition of the switch* also constituted a defect in the switch. *Id.*

The evidence presented by appellant regarding the unguarded switch showed that Eaton's predecessor-in-interest 1) designed the electronic system which controlled the operation of the switch, N.T. at 447 (Feb. 29, 1984); 2) was present when the decision was reached regarding the type of limit switch that would be used on the press, N.T. at 535–36 (Mar. 1, 1984); 3) determined whether a particular angled placement of the switch on the press would have any influence on the electrical control, *id.* at 537–38; and 4) designed safety features into the electronic system which controlled the operation of the press, *id.* at 485–88. It certainly was a reasonable inference that appellee Eaton, therefore, was at least partially responsible for the unguarded condition of the switch which "was a defect in design and manufacture as installed and as used." N.T. at

544 (Mar. 1, 1984). And the jury so found by assigning 35% of the liability to appellee Eaton.

Accordingly, I would reverse the order of Superior Court and reinstate the judgment entered by the Court of Common Pleas of Philadelphia County.

PAPADAKOS, J., joins in this dissenting opinion.