PAVEX, INC. and Liberty
Excavators Inc.

v.

YORK FEDERAL SAVINGS AND LOAN
ASSOCIATION and York Financial
Corporation

v.

Dorothy J. Kauffman HECK
a/k/a Dorothy J. Heck.

Appeal of YORK FEDERAL SAVINGS
AND LOAN ASSOCIATION and York
Financial Corporation, Appellants.

PAVEX, INC. and Liberty Excavators
Inc., Appellants,

v.

YORK FEDERAL SAVINGS & LOAN
ASSOCIATION and York Financial
Corporation

v.

Dorothy J. Kauffman HECK
a/k/a Dorothy J. Heck.

Superior Court of Pennsylvania.

Argued March 3, 1998.
Filed July 31, 1998.

Benjamin F. Riggs, Jr., York, for York Federal Savings & Loan Ass'n and York Financial Corp.

Robert A. Korn, Plymouth Meeting, for Pavex Inc. and Liberty Excavators, Inc.

Dorothy Heck, Pro Se.

Before CAVANAUGH, POPOVICH and FORD ELLIOTT, JJ.

**FORD ELLIOTT, Judge:**

In this appeal and cross-appeal, we address an issue of first impression in Pennsylvania; namely, whether the fictitious payee defense asserted by a bank pursuant to 13 Pa.C.S.A. § 3405(a)(3) of the Uniform Commercial Code ("UCC") constitutes an absolute defense, or whether the bank must have acted in good faith to assert the defense. We also address cross-appellant Pavex's claim that the trial court erred when it precluded Pavex from introducing evidence of damages in the form of counsel fees, accounting fees, administrative expenses and expert witness fees. After a thorough review of the record and analysis of the issues, we affirm.

The statement of facts set forth by the trial court, the Honorable J. Wesley Oler, Jr., and adopted as our own, follows:

Viewing the evidence in the light most favorable to Plaintiffs [as verdict winners [1]], the facts may be summarized as follows: During the period from February, 1986, through April, 1989, Additional Defendant [Dorothy] Heck worked as a payroll clerk for Plaintiffs Pavex, Inc., and Liberty Excavators, Inc.[2] Commencing in December of 1986, Heck generated 882 payroll checks payable to various current and former employees of Plaintiffs for services which were never rendered. These checks were drawn on the former C.C.N.B. bank in New Cumberland, Cumberland County, Pennsylvania, which served as Plaintiffs' bank during the time period in question. Additional Defendant Heck deposited these payroll checks in her personal checking account at Defendant York Federal's Camp Hill, Cumberland County, branch.

Additional Defendant Heck and her husband, Walter L. Heck, had opened a joint checking account at Defendant York Federal's Camp Hill branch on November 13, 1986. One month later, on December 14, 1986, Heck deposited the first of the 882

---

1. This is the proper basis for review of a denial of a motion for judgment n.o.v., such as the one at issue in this case. *Vargo v. Koppers Co., Inc.,* 452 Pa.Super. 275, 278–280, 681 A.2d 815, 817 (1996), *appeal granted in part,* 548 Pa. 122, 695 A.2d 412 (1997), citing *Wenrick v. Schloemann–Siemag,* 523 Pa. 1, 3–5, 564 A.2d 1244, 1246 (1989).

2. Ms. Heck was actually employed by Leasex, Inc., "which performed administrative functions, such as payroll and bookkeeping, for Plaintiffs. N.T. 50–51 (Vol.I). In January of 1996, Leasex merged into Plaintiff Pavex, Inc. N.T. 51 (Vol.I)." (Trial court opinion, 7/10/97 at 4 n. 11.)

forged payroll checks into the account. Heck endorsed the 882 payroll checks by forging the signatures of the various payees of the checks. Heck sometimes attempted to disguise her handwriting or copy the signatures of the check payees; on other occasions, she employed her own handwriting. Heck continued depositing forged payroll checks into her account at Defendant York Federal until 1989.

According to Defendant York Federal's check-depositing policy, endorsements on the back of a check were supposed to match exactly the payee's name shown on the front of a check. Of the 882 forged payroll checks deposited by Heck in her personal checking account at Defendant York Federal's Camp Hill branch, 264 contained endorsements which did not match the payee's name on the front of the check. Endorsements on the checks were missing middle initials, had incorrect middle initials, or differed in spelling from those of the payees.

Additionally, under Defendant York Federal's endorsement policy, only the last person who endorsed a check was to be allowed to negotiate it. Only five to ten of the 882 forged payroll checks which Heck deposited into her checking account included an endorsement by Heck in her own name, in addition to a forged payee endorsement. None of the forged checks was ever refused by Defendant York Federal. According to expert testimony presented at the trial, the deposit of a payroll check made out to another person in the depositor's own account, as was the case here, should have aroused suspicion that something improper was going on. No one at Defendant York Federal affirmatively asked Heck why she was depositing other people's payroll checks into her own account, or asked for verification that she was authorized to do so.

On February 18, 1987, Defendant York Federal allowed Heck to add the name of James F. Dormer to her personal checking account. Defendant York Federal did not obtain any information directly from James F. Dormer regarding the addition of his name to Heck's account. Nor was Heck required to provide pertinent identi-fying information about James F. Dormer, such as his social security number, when adding his name to her account. Instead, Heck was provided with a blank signature card to fill out. She forged James F. Dormer's signature on the card and returned it to the bank.

Heck told bank employees that James F. Dormer was her father. Dormer was not Heck's father. Heck also told bank employees that Dormer was employed by Pavex and cashed payroll checks for fellow employees as a convenience to them. Heck volunteered this explanation of her activities; as previously noted, bank employees never commenced an inquiry of Heck as to why she was depositing other people's pay checks in her personal checking account. In addition, Defendant York Federal had been previously aware that Heck's husband had had a checking account with another bank which had been closed due to insufficient funds.

During the period of time when Heck was depositing the 882 forged payroll checks in her account, Heck applied for a personal loan from Defendant York Federal. The manager of Defendant York Federal's Camp Hill branch refused to approve the loan due to Heck's bad credit rating.

Defendant York Federal's employees discussed Heck's third-party payroll check depositing activities on more than one occasion. Bank personnel also discussed contacting Plaintiff Pavex, Inc. to determine whether Heck had permission to deposit employee payroll checks in her personal account. However, the manager of Defendant York Federal's Camp Hill branch did not contact Defendant York Federal's legal department, his superiors, or other members of management regarding the propriety of contacting Plaintiff Pavex, Inc. Instead, in a discussion with an administrative assistant at the bank regarding the possible impropriety of Heck's payroll deposits, the manager stated that Plaintiff Pavex, Inc., should not be informed of the transactions due to financial privacy concerns. The manager affirmatively chose to take no action as long as the payroll checks did not bounce.

Trial court opinion, 7/10/97 at 4–10 (footnotes omitted).[3]

The procedural history of the case, likewise taken from the trial court's exemplary opinion, follows:

Plaintiffs commenced this action in December of 1989, asserting claims for negligence, gross negligence, breach of warranty, and conversion against Defendant York Federal and also against York Financial Corporation. The negligence and gross negligence claims were withdrawn by Plaintiffs before trial.

Plaintiffs and Defendants both filed motions for summary judgment. These motions were denied by order of court, accompanied by an opinion, dated August 2, 1994.

Trial commenced on September 16, 1996. At the close of Plaintiffs' case-in-chief, Defendants moved for a compulsory nonsuit on the ground that Plaintiffs had failed to present evidence that Defendant York Federal had acted in bad faith. The motion was denied. Defendant York Financial Corporation also moved for a compulsory nonsuit on the ground that it was a separate corporation from Defendant York Federal, and not responsible for its actions. That motion was granted. Defendant York Federal moved for a directed verdict after all parties rested, asserting that it was entitled to judgment as a matter of law, because there was no evidence of bad faith. That motion was denied.

On September 20, 1996, the jury returned a verdict in favor of Pavex, Inc., in the amount of $167,385.02, and in favor of Liberty Excavators, Inc., in the amount of $2,377.56. Since the total amount of the forged-endorsement checks was over a quarter of a million dollars, the jury's verdict represented partial victories for both sides, and indicated the jury's considered belief that after the passage of a certain amount of time Defendant York Federal was no longer acting in good faith in dealing with the checks. The jury also found in favor of Defendant York Federal against

Additional Defendant Heck in the amount of $169,762.58.[4]

Defendant York Federal filed a motion for post-trial relief, requesting in substance that the court enter judgment n.o.v. in its favor as to all claims against it. Plaintiffs also filed a motion for post-trial relief, requesting a new trial on the issue of damages. Both post-trial motions were denied by order of court dated February 26, 1997. Defendant York Federal and Plaintiffs filed an appeal and cross-appeal respectively to the Superior Court from the judgment inter se entered on the jury verdict.

Trial court opinion, 7/10/97 at 2–4 (footnotes omitted).

## APPEAL OF YORK FEDERAL

Our supreme court set forth the proper standard for appellate review of an order denying a motion for judgment n.o.v. in *Wenrick v. Schloemann–Siemag*, 523 Pa. 1, 564 A.2d 1244 (1989):

[T]he proper scope of review for an appellate court examining a denial of judgment n.o.v., according to the longstanding rule, is whether, reading the record in [the] light most favorable to the verdict winner and granting him the benefit of every favorable inference, there is sufficient competent evidence to support the verdict.

*Id.* at 4, 564 A.2d at 1246. Additionally:

There are two bases upon which a j.n.o.v. can be entered: one, the movant is entitled to a judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant.

*Simmons v. Pacor, Inc.*, 543 Pa. 664, 672, 674 A.2d 232, 236 (1996).

With this standard before us, we turn to York Federal's claim that the record does not support the jury's conclusion that York Federal acted in bad faith. To reach that issue, however, we must first decide if Penn-

---

3. The pages of the trial court opinion are not numbered. We have assigned page numbers for convenience.

4. This amount represents the total of the awards of $167,385.02 and $2,377.56.

sylvania law allows a plaintiff to assert the bad faith exception to the so-called fictitious payee defense.

Division 3 of Pennsylvania's Commercial Code ("UCC") governs negotiable instruments, including checks. 13 Pa.C.S.A. § 3104(b).

> As part of an attempt to establish uniform rules governing the relationship between banks and their customers, the UCC allocates the losses caused by forged endorsements on negotiable instruments based on the relative responsibilities of the parties to a transaction. Generally, a drawee bank is not entitled to debit the drawer's account when the bank pays over a forged endorsement, because an 'unauthorized signature is wholly inoperative as that of the person whose name is signed.' N.J.Stat.Ann § 12A:3–404(1) (West 1962). However, a drawee bank which has paid over a forged endorsement can shift the loss 'upstream' to previous endorsers, e.g., collecting banks, by way of an action for breach of warranty of good title. Ultimately, the 'loss falls on the party who took the check from the forger, or on the forger himself.' Thus, the drawer of the check can usually avoid liability on a check with a forged endorsement simply by showing the unauthorized endorsement and the depositary or initial collecting bank will likely suffer the loss.

*McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 759 (3d Cir. 1990), quoting *Perini Corp. v. First Nat'l Bank of Habersham County*, 553 F.2d 398, 404 (5 th Cir.1977) (other citations omitted).

The so-called "fictitious payee" section of the UCC:

> creates a limited exception to this general rule when an employee, intending the payee to have no interest in the instrument, causes his employer to draw a check made payable to [the payee]. . . . This exception is created because of the differing responsibilities of the parties in such a situation.

*Id.*

In Pennsylvania, the fictitious payee defense applicable at the time Pavex filed suit

in 1989 was set forth in § 3405 of the UCC. That section provided:

### § 3405. Impostors: signature in name of payee

> **(a) General rule.**—An indorsement by any person in the name of a named payee is effective if:
>
> . . . .
>
> > (3) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest.

13 Pa.C.S.A. § 3405(a)(3) (repealed).[5] As the Uniform Commercial Code Comment explains:

> 4. Paragraph (c)[6] is new. It extends the rule of the original subsection 9(3) to include the padded payroll cases, where the drawer's agent or employee prepares the check for signature or otherwise furnishes the signing officer with the name of the payee. The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee.

13 Pa.C.S.A. § 3405, Uniform Commercial Code Comment, Purposes of Changes and New Matter.

The parties and the trial court apparently agreed, however, that the general "good faith" provision applicable to all sections of the UCC also applies to the fictitious payee defense. That section, § 1203, provides that "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." Section 1201 then defines "good faith" as "Honesty in fact in

---

**5.** This section was amended in 1992, July 9, P.L. 507, No. 97, § 5, effective in one year.

**6.** Paragraph (a)(3) in Pennsylvania.

the conduct or transaction concerned." 13 Pa.C.S.A. § 1201.

■ We agree with the parties and the trial court that the good faith provision applies to banks asserting the fictitious payee defense. As the Third Circuit Court of Appeals opined when it decided the same issue under New Jersey law:

As we have discussed, § 3–405(1)(c) is intended to allocate the losses resulting from forgeries based on the relative responsibilities of the parties. Rather than utilizing the general rule of the Code and imposing liability on the depositary bank, the 'faithless employee' liability rule is supported to achieve a more socially desirable result by encouraging employers to make prudent personnel decisions.

But clearly the attempt both to achieve the most socially desirable result and to create the proper incentives is frustrated when a bank's commercially outrageous conduct is insulated from legal consequences under § 3–405(1)(c) in order to encourage an employer to be more careful in hiring and supervising its employees. Such extraordinary misconduct simply cannot go undeterred.... Section 3–405(1)(c) was not designed to allocate forgery losses when parties act outside commercially foreseeable norms.

Therefore, we predict that the New Jersey Supreme Court would decide that "the fictitious payee rule is not intended to provide an absolute defense," but instead hold that in order to successfully assert the effectiveness of a forged endorsement under § 3–405(1)(c), the bank must have acted in good faith when paying the instrument.

*McAdam*, 896 F.2d at 761, quoting *City of Phoenix v. Great West. Bank & Trust*, 148 Ariz. 53, 57, 712 P.2d 966, 970 (App.1985) (other citations omitted). As the *McAdam* court observed, numerous other jurisdictions have likewise applied the good faith exception to the fictitious payee defense. *See McAdam*, 896 F.2d at 761, citing cases from the Tenth Circuit Court of Appeals, and from Wisconsin, Texas, Arizona, New York, Nebraska, and Tennessee.

The real argument, then, centers on the meaning of "bad faith." A minority of jurisdictions have held that a bank's mere negligence constitutes bad faith. *See Shearson Lehman Brothers, Inc. v. Wasatch Bank*, 788 F.Supp. 1184, 1192 (D.Utah 1992) (noting that only California and Nebraska have adopted this rule). At the opposite extreme, other jurisdictions appear to require that a bank subjectively intend to facilitate the forger's scheme or have actual knowledge of the fraud and ignore it. *Id.* at 1195; *Retail Shoe Health Comm'n. v. Manufacturers Hanover Trust Co.*, 160 A.D.2d 47, 558 N.Y.S.2d 949, 951 (1990) (principals of bank must be actual participants in unlawful activity); *British Caledonian Airways Limited v. First State Bank of Bedford, Texas*, 819 F.2d 593, 596 (5th Cir.1987) (actual knowledge required). Even in the jurisdictions requiring actual knowledge, however, "in some cases a large number of strong 'should have knowns' may support a jury inference of 'did know.'" *Id.* at 598.

In the middle of these two extremes are the jurisdictions finding bad faith in "a bank's conscious and deliberate decision to remain ignorant of the existence of a fraudulent scheme despite irregularities on the face of the transaction...." *Shearson Lehman*, 788 F.Supp. at 1196. As the *Shearson Lehman* court noted, "Such conduct bridges the gap between negligent and intentional conduct and should subject to [sic] the bank to liability." *Id.* Likewise, while a bank's mere failure to follow commercially reasonable banking procedures or to comply with its own policies may not constitute bad faith, nevertheless, gross violations of bank policy over a protracted period of time, or involving numerous transactions and large sums of money, have been found either to constitute bad faith or to raise a jury question. *McAdam*, 896 F.2d at 762; *Kraftsman Container Corp. v. United Counties Trust Co.*, 169 N.J.Super. 488, 497, 404 A.2d 1288, 1293 (1979).

■ We recognize that under the 1992 amendments to § 3405, mere negligence on the part of the bank will bar the "fictitious

payee" defense.[7] Nevertheless, we agree with the trial court that under the prior statute, which required a showing of bad faith, bad faith may properly be found where there has been either a gross violation of bank policies over an extended period and/or involving large sums, or a conscious and deliberate decision to ignore the existence of a fraudulent scheme. (Trial court opinion, 7/10/97 at 11–12.) As the *McAdam* court observed:

> In reaching this result, we recognize that since § 3–405(1)(c) is a banker's exception which dramatically departs from the general UCC rule and narrows the liability of a bank, courts should be cautious in expanding the section's scope beyond its explicit rationale.

*McAdam*, 896 F.2d at 762.[8]

■ Having thus determined the meaning of bad faith for purposes of § 3405, we note that the determination of whether a party has acted in good faith is generally a question for the finder of fact, in this case the jury. *Coy v. Ford Motor Credit Co.*, 422 Pa.Super. 76, 82–83, 618 A.2d 1024, 1027 (1993). Under the applicable standard, we must therefore determine whether Pavex presented sufficient evidence of bad faith to preclude our finding that "the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Simmons, supra* at 672, 674 A.2d at 236.

■ We have already set forth the relevant evidence in the light most favorable to the verdict winner. *See supra*. A review of that evidence indicates that it clearly supports the jury's finding of partial liability on the part of York Federal. York Federal violated its own policies for over two years in a scheme involving almost 900 transactions and over a quarter of a million dollars. Despite the fact that Ms. Heck had only been a bank customer for one month when she started depositing the payroll checks, the bank's branch manager deliberately chose to ignore

perceived irregularities in Ms. Heck's transactions because she was personable (R.R. at 834a), rather than verifying her authority to deposit the payroll checks. As the trial court correctly observed, the jury's verdict, which found York Federal liable for approximately $170,000 of the $258,000 loss (R.R. at 706a), indicates that the jury decided "that at a certain point, the bank was no longer acting in good faith." (Trial court opinion, 7/10/97 at 17.)

We thus find this case distinguishable from *Shearson Lehman, supra*, relied upon by York Federal. In *Shearson Lehman*, the court found that the bank did not act in bad faith where it treated valued customers preferentially by not scrutinizing their transactions as carefully as other customers'. The Shearson Lehman employee was, however, a valued customer whose preferential treatment pre-dated the suspect transactions. *Shearson Lehman*, 788 F.Supp. at 1196. Furthermore, there was no evidence that the bank employees "perceived specific irregularities in the checks and made a wilful [sic] and deliberate decision not to investigate those irregularities." *Id.* As a result, we find no merit to York Federal's issue on appeal.

## CROSS APPEAL OF PAVEX

In its cross-appeal, Pavex alleges that it is entitled to a new trial on the issue of damages because § 4207 of the UCC provides statutory authority for an award of attorneys' fees, administrative expenses and expert witness fees. (Appellees' brief at ii, 2.)

> The general rule in an action at law is that the costs inherent in a lawsuit are awarded to and should be recoverable by the prevailing party. These recoverable costs are the costs of proceeding in court, not those of preparation, consultation, and fees generally. Costs not incurred in the court action, including counsel fees, are recoverable only on the basis of statutory authority. Only in the rarest of circumstances is

---

7. 13 Pa.C.S.A. § 3405(b) and Uniform Commercial Code Comment–1990, 1, 2, 1992, July 9, P.L. 507, No. 97, § 5, effective in one year.

8. We recognize that *McAdam* involved a claim by the *payee* against the bank, and is therefore not directly on point. Its analysis of the rationale behind the fictitious payee defense and its good faith requirement is, however, relevant.

the unsuccessful party made to bear all of the expenses incurred in the litigation.

*Gregory v. Harleysville Mutual Insurance Co.*, 374 Pa.Super. 33, 37–38, 542 A.2d 133, 135 (1988) (citations omitted) (footnote omitted).

Additionally, when construing a statute, a court is required to ascertain and effectuate the intention of the General Assembly. 1 Pa.C.S.A. § 1921(a). Under the general provisions of the Uniform Commercial Code:

> The remedies provided by this title shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this title or by other rule of law.

13 Pa.C.S.A. § 1106(a).

■ As noted *supra*, Pavex claims statutory authority for its award of counsel fees and other expenses based on § 4207(c) of the UCC. That section provides in pertinent part that "Damages for breach of[, *inter alia*, warranties to payor] shall not exceed the consideration received by the customer or collecting bank responsible plus finance charges *and expenses related to the item, if any*." 13 Pa.C.S.A. § 4207(c) (rescinded) (emphasis added).[9] Comment 5 to § 4207 provides that "The 'expenses' referred to in this phrase may be ordinary collecting expenses and in appropriate cases could also include such expenses as attorneys fees." 13 Pa.C.S.A. § 4207, Uniform Commercial Code Comment 5 (rescinded).[10]

■ We find that the language of the comment indicates a clear intention that the award of attorneys' fees be discretionary with the trial court. Likewise, the award of expert witness fees, which are not an "ordinary collecting expense," must be left to the court's discretion.[11] *See In re Kling*, 433 Pa. 118, 120–122, 249 A.2d 552, 554 (1969) (expert witness fees are not taxable as costs). Our review is therefore limited to determining whether the trial court abused its discretion when it refused to allow such expenses into evidence. "An abuse of discretion is not merely an error in judgment; rather it occurs when the law is overridden or misapplied, or when the judgment exercised is manifestly unreasonable or the result of partiality, prejudice, bias or ill-will." *Pilon v. Bally Engineering Structures*, 435 Pa.Super. 227, 233, 645 A.2d 282, 285 (1994), *appeal denied*, 539 Pa. 680, 652 A.2d 1325 (1994).

■ In its opinion, the trial court explains:

> [Pavex's] underlying claim under Section 4207 was an assigned cause of action from the drawee bank for breach of warranty. . . .

> The court was of the view that [Pavex's] attempt to recover additional damages under Section 4207(c) of the Code was not meritorious for two reasons. First, the drawee bank in this case suffered no actual loss, having debited [Pavex's] accounts for the checks, and the relief awarded to [Pavex] was not attributable to the assigned claim under Section 4207.

> Second, the authority under Section 4207(c) for an award of the type of additional damages (such as attorneys' fees) sought on the assigned claim was far from clear.

Trial court opinion, 7/10/97 at 18–19 (footnote omitted). The trial court then set forth the law relevant to an award of attorneys' fees, noting that statutes authorizing their award are penal in nature and must be strictly construed. *Id.* at 20, citing *McKenzie v. Nationwide Ins. Co.*, 23 D. & C.3d 469, 472 (1981); *Freeze v. Donegal Mutual Ins. Co.*, 412 Pa.Super. 305, 311–312, 603 A.2d 595, 598

---

9. 1979, No. 1, P.L. 255, No. 86, § 1. This section was deleted by act 1992, July 9, P.L. 507, No. 97, § 10.

10. We agree with the trial court that the comment is not part of the legislation and therefore has no binding effect. (Trial court opinion, 7/10/97 at 21 n. 54.) *See* 1 Pa.C.S.A. § 1939 (a comment may be consulted in the construction of a statute if the comment were published or gen-erally available to the General Assembly prior to its considering the statute).

11. While Pavex refers to "administrative expenses" in its brief, it does not delineate the nature of these expenses or cite any cases supporting their award. Rather, its argument focuses on attorneys' fees.

(1992), *appeal denied*, 532 Pa. 656, 615 A.2d 1312 (1992); 1 Pa.C.S.A. § 1928(b)(1).

Then, noting that the statute itself does not expressly provide for the recovery of attorneys' fees, that our supreme court has proscribed the award of attorneys' fees absent express statutory authority, and that penal statutes are to be strictly construed, the trial court concluded that the recovery of attorneys' fees in this case would have been inappropriate. (Trial court opinion, 7/10/97 at 20, citing, *inter alia, McAdam, supra* at 776 (award of attorneys' fees inappropriate under the identical provision of New Jersey's Commercial Code).) We find no abuse of discretion.

Similarly, when considering the appropriateness of expert witness fees and administrative expenses, the trial court opined:

Such costs ... are not generally recoverable without statutory authorization; Section 4207(c) does not expressly refer to them; and the comment to Section 4–207 of the Uniform Commercial Code does not include them among examples of such expenses. In a case in which both sides prevailed in part, an award of such litigation expenses to either party would not, in the court's view, have been appropriate.

Trial court opinion, 7/10/97 at 21–22 (footnote omitted). Again, we find no abuse of discretion.

Judgment affirmed.