J-A13037-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| AEGIS SECURITY INSURANCE COMPANY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GREATER JOHNSTOWN WATER AUTHORITY, RDM JOHNSTOWN, LLC, AMERISERV FINANCIAL BANK, AND AMERISERV FINANCIAL TRUST | : : : : | |
| | : | |
| APPEAL OF: GREATER JOHNSTOWN WATER AUTHORITY | : : | No. 1520 WDA 2017 |

Appeal from the Judgment Entered October 10, 2017
in the Court of Common Pleas of Cambria County,
Civil Division at No(s):  2009-0278

BEFORE:  OLSON, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                FILED FEBRUARY 12, 2019

Greater Johnstown Water Authority ("GJWA") appeals from the Judgment entered in its favor, and against AmeriServ Financial Bank and AmeriServ Financial Trust (collectively "AmeriServ"),[1] in the amount of $60,000 plus post-judgment interest.  We affirm.

The trial court set forth the relevant procedural history, and findings of fact and conclusions of law, as follows:

_____

[1] While AmeriServ Financial Bank and AmeriServ Financial Trust are distinct companies, and AmeriServ Financial Trust processed the transactions at issue in this case, the trial court treated the companies interchangeably in addressing the claims.  See Brief for Appellees at 15 n.2.  Thus, to avoid further confusion, we will refer to the companies collectively.

[In January 2009,] Aegis Insurance Security Company (Aegis) initiated this action against [GJWA] and RDM Johnstown, LLC (RDM)[,] alleging that GJWA and RDM were liable to Aegis for $162,356.63. Aegis alleged liability based on the failure of a check[,] in said amount[,] to reach Aegis pursuant to an agreement entered into between Aegis and GJWA as part of a larger Escrow Agreement. GJWA also asserted cross-claims against [AmeriServ] alleging that, should GJWA be found liable to Aegis, the actions of [AmeriServ] were the cause of GJWA's breach.

Summary Judgment was entered by the [trial c]ourt[,] dismissing all of Aegis's claims against RDM and dismissing all claims against GJWA except Aegis's claim for breach of contract. On May 2, 2017, Aegis [and] GJWA [] entered into a Consent Judgment in favor of Aegis and against GJWA[,] in the amount of $120,000 plus post-judgment interest at the legal rate from the date of the judgment. Thus, the only issue remaining at the time of the non-jury trial was GJWA's cross-claims against [AmeriServ]. Upon careful and thorough review of the evidence presented, the briefs of [the] parties, and the laws of this Commonwealth, the [trial c]ourt makes the following Findings of Fact and Conclusions of Law:

1. GJWA is a municipal water authority that provides water services in and around Johnstown, Pennsylvania.

2. On or about December 5, 2006, GJWA awarded William H. Duriez, Jr.[,] and Lynn A. Duriez, dba Duriez Excavating (collectively, "Duriez")[,] a contract in the amount of $826,397.75 to perform excavation work for a public works project known as the Conemaugh Township Interconnection Project (the "Project").

3. [Aegis] issued payment and performance bonds for the Project as surety for Duriez.

4. Aegis, Duriez, North American Construction Services ("NACS"), and Bremer Bank entered [into] a written Escrow Agreement dated December 12, 2006, whereby they agreed that funds paid to Duriez in connection with the Project were to be deposited into an Escrow Account to be established at Bremer Bank and administered by NACS.

5. GJWA was not a party to the Escrow Agreement. However, Duriez provided GJWA with written instructions, entitled "Instructions to Obligee," which were signed by a representative of GJWA and specified the manner in which GJWA was to disburse payments for Duriez's work on the Project.

6. With respect to payments made by check, the Instructions to Obligee provide:

Checks are to be made payable to: "William H. Duriez, Jr[.,] dba Duriez Excavating, Escrow Account #6736246[,]" and sent to the following address:

Bremer Bank, National Association - Corporate Services
P.O. Box 64346
St. Paul, Minnesota 55164-0346

7. GJWA funded public works projects it conducted, including the [Project], with a "Construction Fund" in an account known as the "1998 Capital Improvement and Redemption Fund."

8. At all relevant times[,] AmeriServ held the Construction Fund as trustee for GJWA under a September 1, 1992 "Trust Indenture" entered [into] between GJWA and AmeriServ's predecessor, United States National Bank in Johnstown.

9. [RDM], with whom GJWA has a services agreement, initiated the disbursement of Construction Fund monies for GJWA's various projects by preparing payment "requisitions" and sending them to AmeriServ.

10. The requisition packages that RDM sent to AmeriServ would ordinarily first be received by David Margetan ("Margetan"). Margetan is an AmeriServ employee who[,] at all relevant times[,] held the positions of Assistant Vice-President and Corporate Trust Officer, and served as the trust administrator for the Construction Fund.

11. Upon receiving a requisition package, Margetan would review the documents to check that they were properly prepared and to determine how payment was to be disbursed.

- 3 -

12. Following his review, Margetan would give the requisition package to his Trust Clerk, Toni Schuller ("Schuller"), with instructions to have the requisition paid. Schuller, in turn, typically passed the requisition package[,] along with any relevant payment instructions[,] to the Disbursement Clerk, who then used the information provided by Schuller to generate a check and mail it to the person or entity to be paid.

13. On January 3, 2007, an RDM employee named Nancy Miller ("Miller") received an email from Mike Pecard ("Pecard"), the Escrow Account Manager for NACS.

14. The subject line of Pecard's email reads, "Duriez Excavating-Conemaugh Township Interconnection[,]" and a copy of the Instructions to Obligee was attached to the email.

15. The body of Pecard's email states:

> In regards to the attached directive of funds that [was] signed, I'm just following up to verify that this process is in place and that funds on the above referenced project will be directed to:

> Bremer Bank, NA - Corporate Services
> P.O. Box 64346
> St. Paul, MN 55164-0346

> If you could please respond to my email or give me a call to verify this, that would be greatly appreciated.

The account number for the Escrow Account at Bremer Bank does not appear in the email.

16. Pecard's email included the "Instructions to Obligee" as an attachment.

17. At approximately the same time in January 2007, Miller initiated a phone call with Schuller, who served as Miller's primary point of contact at AmeriServ, regarding payments to Duriez for the Project.

18. At or about the time she called [] Schuller, Miller made handwritten notes on a paper copy of the email stating "Spoke to Toni @ AmeriServ about this."

19. Miller further testified that she did not make any additional record of her phone conversation with Schuller. Miller stated that this was her usual practice in similar situations.

20. Schuller testified that she was authorized to receive special instructions in matters such as this and that she could recall that Miller normally called Schuller anytime Miller had special instructions.

21. Schuller further testified that, although she could not recall working on this matter, her usual practice was to receive oral instructions without requiring further written instructions. Schuller would then attach the instruction to each individual requisition.

22. Schuller reiterated multiple times that she could not recall working specifically on this matter or the contents of any conversations with Miller.

23. Testimony by Miller revealed that[,] after speaking to Schuller, Miller forwarded a copy of Pecard's email, along with the Instructions to Obligee as an attachment, to Betty Rhoades ("Rhoades"), another RDM employee, and told Rhoades to attach Pecard's email as well as the attached Instructions to Obligee to all future requisitions in this matter.

24. However, evidence of record and the testimony of Rhoades show[s] that Rhoades did not include the attached Instructions to Obligee as part of subsequent requisitions. Rhoades only included Pecard's cover email that instructed payments be sent to Bremer Bank.

25. RDM sent the first of six monthly requisitions to AmeriServ to disburse progress payments for Duriez's work on the Project in February of 2007.

26. The first payment requisition that RDM sent to AmeriServ for the Project is dated February 15, 2007.

27. The first requisition states:

    Payee: Duriez Excavating

Amount to be Paid: Sixty-three thousand eight-hundred fifty-six and 02/100 dollars

Purpose of Obligation: Est. #1 Conemaugh Township Interconnection

28. After receiving the first requisition package, AmeriServ prepared check number 498986, dated February 21, 2007, made payable in the amount of $63,856.02 to:

    WILLIAM H DURIEZ JR
    dba DURIEZ EXCAVATING
    ESCROW ACCOUNT 673624

29. AmeriServ mailed check number 498986 to Bremer Bank, and the proceeds of the check were deposited into the Escrow Account.

30. The second payment requisition that RDM sent to AmeriServ for the Project is dated March 15, 2007. The second requisition states:

    Payee: Duriez Excavating

    Amount to be Paid: Three hundred seven thousand two hundred fifty-six and 71/100 dollars

    Purpose of Obligation: Est. #2 Conemaugh Township Interconnection

31. After receiving the second requisition package, AmeriServ prepared check number 500897, dated March 20, 2007, made payable in the amount of $307,256.71 to:

    DURIEZ EXCAVATING
    121 DURIEZ LANE
    NORTHERN CAMBRIA PA 15714

32. AmeriServ mailed check number 500897 to Bremer Bank, and the proceeds of the check were deposited into the Escrow Account.

33. The third payment requisition that RDM sent to AmeriServ for the Project is dated April 12, 2007.

34. The third requisition states:

    Payee: Duriez Excavating

    Amount to be Paid: One hundred thirteen thousand three hundred and 46/100 dollars

    Purpose of Obligation: Est. #3 Conemaugh Township Interconnection

35. After receiving the third requisition package, AmeriServ prepared check number 502994, dated April 16, 2007, made payable in the amount of $113,300.46 to:

    WILLIAM H DURIEZ JR DBA DURIEZ EXCAV
    BREMER BANK
    CORP SRVS ATTN MIKE PEC[]ARD
    PO BOX 64346
    ST PAUL MN 55164-0346

36. AmeriServ mailed check number 502994 to Bremer Bank, and the proceeds of the check were deposited into the Escrow Account.

37. The fourth payment requisition that RDM sent to AmeriServ for the Project is dated May 10, 2007.

38. The fourth requisition states:

    Payee: Duriez Excavating

    Amount to be Paid: One-hundred sixty-two thousand three-hundred fifty-six and 63/100 dollars

    Purpose of Obligation: Conemaugh Township Interconnection

39. After receiving the fourth requisition package, AmeriServ prepared a fourth check dated May 15, 2007, bearing check number 504782, and made payable in the amount of $162,356.63 to:

    DURIEZ EXCAVATING

121 DURIEZ LN
NORTHERN CAMBRIA PA 15714-1805

40. [] Margetan did not review the fourth requisition package or approve disbursement of the fourth check because he was on vacation at the time.

41. The fourth check was prepared by Schuller because she was filling in for the regular disbursement clerk, Deb Swincinski, who was absent from work that day.

42. Schuller did not mail the fourth check to Bremer Bank.

43. AmeriServ sent the fourth check directly to [William H. Duriez, Jr.]

44. On May 17, 2007, [William H. Duriez, Jr.,] deposited the check at AmeriServ's Northern Cambria location and applied the proceeds to pay amounts owed on two AmeriServ loan accounts.

45. [William H. Duriez, Jr.,] applied $62,356.63 to pay down principal and interest on AmeriServ Flex Line of Credit Loan account number 1800960, and $100,000.00 to pay off AmeriServ Home Equity Loan account number 20051.

46. Th[e trial c]ourt finds that the evidence and testimony established that [AmeriServ] w[as], at some time, instructed by GJWA as to how to make out checks and where to send said checks. Such was proved by the testimony of Miller and Schuller, as well as the email from Pecard confirming that payments were to be sent to Bremer Bank[,] which was attached as part of the fourth requisition. The evidence further showed that the initial check included the escrow number[,] as required in the Instructions to Obligee.

47. The [trial c]ourt finds that the check for the first requisition was properly executed. The check contained the escrow account number as required by the Instructions to Obligee and was sent to Bremer Bank. [AmeriServ] could not have done so without receiving direction from GJWA.

48. [AmeriServ], acting as trustee, owed fiduciary duties to GJWA as a result of the Trust Indenture entered into by [AmeriServ] and GJWA on September 1, 1992.

49. The [trial c]ourt finds that [AmeriServ] breached their fiduciary duties to GJWA by failing to follow instructions given by GJWA.

50. [AmeriServ's] breach of fiduciary duties resulted in the payment of $162,356.63 for the fourth requisition being improperly sent to Duriez instead of Bremer Bank as instructed by GJWA. Such misdirection resulted in Duriez applying said monies to other existing obligations at AmeriServ.

51. The [trial c]ourt further finds that both GJWA and [AmeriServ] were causes of the eventual misdirection of the check. But for the failure of GJWA to attach the Instructions to Obligee and include the correct "payee" information on its requisitions, such misdirection would not have happened. However, but for [AmeriServ's] failure to follow GJWA's original instructions to fill out checks consistent with the first check executed in this matter, or, at least, seek clarification from GJWA as a result of the attached Pecard email, the misdirection of the check would not have occurred.

52. Thus, based on GJWA's failure to give consistently clear instructions to [AmeriServ,] and [AmeriServ's] breach of fiduciary duties, the [trial c]ourt finds that GJWA and [AmeriServ] are equally responsible for the misdirection of the $162,356.63 check resulting in damages to Aegis.

53. Accordingly, th[e trial c]ourt finds that [AmeriServ is] liable to GJWA for one-half of the $120,000 to be recovered from GJWA by Aegis: $60,000 plus post-judgment interest at the legal rate from the date of judgment.

Trial Court Opinion, 5/22/17, at 1-7 (unnumbered).[2]

GJWA filed a timely Motion for Post-Trial Relief. Following a hearing, the trial court denied GJWA's Motion for Post-Trial Relief. Judgment was entered in GJWA's favor, and against AmeriServ, in the amount of $60,000 plus post-judgment interest. Thereafter, GJWA filed a timely Notice of Appeal and a court-ordered Pennsylvania Rule of Appellate Procedure 1925(b) Concise Statement.

On appeal, GJWA raises the following questions for our review:

1. Does the trial court's finding that AmeriServ failed to follow GJWA's instructions as to the proper and intended recipient of a payment entitle GJWA[,] as a matter of law[,] to the remedy prescribed by Pennsylvania's [Uniform] Commercial Code [("UCC")], which is a refund of the misdirected payment with interest from the date of payment?

2. Aside from any legal error, is GJWA entitled to recover the full amount of its settlement with [Aegis] because there is no competent evidence to support, and the trial court's findings of fact are inconsistent with, the conclusion that GJWA's loss would have occurred absent AmeriServ's breach of fiduciary duties[,] or that GJWA's instructions were inadequate such that it shares responsibility for AmeriServ's failure to direct the payment to the proper and intended recipient?

3. Assuming[,] arguendo[,] the trial court [did] not err by depriving GJWA of the remedies provided by the [UCC,] and instead limiting GJWA's potential recovery to the amount of its settlement with [Aegis], was it legal error for the trial court to award GJWA just half that amount despite having found that

_____

[2] We note that the trial court did not cite to any relevant legal authority to support its finding that AmeriServ and GJWA were liable for one-half of the $120,000. Instead, the trial court merely states that AmeriServ's breach of its fiduciary duties caused the misdirection of the check, and that GJWA was equally liable for failing to provide proper instructions.

the payment at issue was misdirected by AmeriServ in breach of fiduciary duties owed to GJWA as a trustee?

Brief for Appellant at 4-6 (issues renumbered).

The relevant standard of review following a non-jury trial is as follows:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue … concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

Stephan v. Waldron Elec. Heating & Cooling LLC, 100 A.3d 660, 664–65 (Pa. Super. 2014) (citation omitted). Further, "[i]n reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact[,] who is usually in a superior position to appraise and weigh the evidence." Ferrer v. Trs. of Univ. of Pa., 825 A.2d 591, 611 (Pa. 2002) (citation omitted).

We address GJWA's first two claims together. GJWA contends that the trial court erred in limiting its recovery to $60,000 plus post-judgment interest where the trial court failed to consider the provisions of the UCC, and found that AmeriServ is responsible for the full amount of the misdirected check.

Brief for Appellant at 24, 29, 30, 34, 40. GJWA argues that AmeriServ's liability is not limited by joint tort-feasor principles, but instead is exclusively governed by the UCC. Id. at 24, 30, 31-33, 34; see also id. at 33 (arguing that "although there is no question that the trial court's findings establish AmeriServ's liability under alternative legal theories that may provide a different measure of damages, AmeriServ's conduct and resulting liability is squarely and exclusively governed by the [UCC].").[3]

GJWA argues that under Article 4 (section 4401) of the UCC, AmeriServ could not charge GJWA's account for the check that was not properly payable to William H. Duriez, Jr. Id. at 29. GJWA asserts that AmeriServ "is strictly liable for the full amount of a misdirected payment where, as here, it improperly executes a customer's payment instructions and charges the customer's account for a disbursement to an unauthorized payee." Id. at 24; see also id. at 24-25. GJWA argues that based upon the trial court's findings of fact, GJWA instructed AmeriServ on the manner in which to prepare and

_____

[3] AmeriServ counters that the provisions of the UCC are inapplicable to the facts of this case. Brief for Appellee at 16; see also id. at 17 (asserting that the "UCC simply does not address a scenario where a customer's instructions to its bank are either incomplete, misleading, or flat-out wrong (as here)."). AmeriServ states that "the trial court obviously utilized its common sense and principles of common law relating to comparative allocation of fault, and determined that both parties were equally responsible for this bad outcome." Id. at 16-17; see also id. at 17 (noting that "[g]iven that the circumstances confronting the trial court do not fit neatly within the statutory provisions of the UCC, the trial court's reliance on common-law principles (and common sense) are entirely understandable, and are legally permissible.").

- 12 -

send the checks. Id. at 27-28, 37. GJWA claims that AmeriServ properly directed multiple checks pursuant to its instructions, and that AmeriServ did not indicate that the instructions were inadequate or required any follow-up instructions. Id. at 37-39; see also id. at 38 (pointing to Schuller's testimony that the usual practice was to receive oral instructions without any further written instructions); id. at 37-38 (arguing that the trial court's finding that AmeriServ would have properly directed the check, had GJWA given different instructions, is speculative). GJWA argues that it did not authorize AmeriServ to make the check payable to Duriez Excavating, and send the check directly to William H. Duriez, Jr., rather than Bremer Bank. Id. at 30; see also id. (arguing that AmeriServ's actions were contrary to the agreement to issue the checks in accordance with GJWA's instructions). GJWA contends that the undisputed evidence, in addition to the trial court's findings of fact, demonstrates that GJWA was not to blame for the misdirected check. Id. at 39.[4]

We must first determine whether the UCC governs the transactions at issue in this case. The UCC is intended to be a "semi-permanent and infrequently-amended piece of legislation," and "is intended to make it possible for the law embodied in the [UCC] to be applied by the courts in the

_____

[4] In an apparent response to the trial court's Findings of Fact and Conclusions of Law, GJWA also contends that AmeriServ breached its fiduciary duty to GJWA. Brief for Appellant at 35, 36, 39-40.

light of unforeseen and new circumstances and practices." 13 Pa.C.S.A. § 1103, cmt. 1; see also Triffin v. Dillabough, 716 A.2d 605, 608 (Pa. 1998) (noting that the purpose of the UCC is to allow people to trade with confidence). The Legislature directed that the UCC

> must be liberally construed and applied to promote its underlying purposes and policies, which are:
>
> (1) to simplify, clarify and modernize the law governing commercial transactions;
>
> (2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and
>
> (3) to make uniform the law among the various jurisdictions.

13 Pa.C.S.A. § 1103(a). "The text of each section [of the UCC] should be read in the light of the purpose and policy of the rule or principle in question, as also of the [UCC] as a whole, and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved." Id. § 1103, cmt.

"Unless displaced by the particular provisions of [the UCC], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy and other validating or invalidating cause, supplement its provisions." Id. § 1103(b); see also id. § 1103, cmt. 4 (noting that "[t]he list of sources of supplemental law in subsection (b) is intended to be merely illustrative of the other law that may supplement the [UCC], and is not exclusive.").

> [W]hile principles of common law and equity may supplement provisions of the [UCC], they may not be used to supplant its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the [UCC] provides otherwise. In the absence of such a provision, the [UCC] preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.

Id. § 1103, cmt. 2 (emphasis in original); see also id. (stating that "the proper scope of [UCC] preemption … extends to displacement of other law that is inconsistent with the purposes and policies of the [UCC], as well as with its text."). Thus, in furtherance of the UCC's goal of uniformity in commercial transactions, common law claims are displaced where both the UCC and the common law would provide a means of recovery for the same loss. See, e.g., Bucci v. Wachovia Bank, N.A., 591 F. Supp. 2d 773, 779 (E.D. Pa. 2008) (stating that "parallel [UCC] and common law claims may be maintained except in circumstances where (1) the [UCC] provides a comprehensive remedial scheme, and (2) reliance on the common law would undermine the purposes of the [UCC].").

Here, the matter at issue involves a misdirected check that was drawn on GJWA's account.[5] Articles 3 and 4 of the UCC set forth the rights, duties and liabilities of banks and customers concerning negotiable instruments, of

---

[5] During the check collection process, the "drawer" of a check issues to the "payee" a check drawn on an account of the drawer at the "drawee bank." A "drawer" is defined as "[a] person who signs or is identified in a draft as a person ordering payment." 13 Pa.C.S.A. § 3103. A "drawee" is defined as "[a] person ordered in a draft to make payment." Id. §§ 3103; 4104.

which checks are a subset.[6]  See *Bucci*, 591 F. Supp. 2d at 779 (stating that "Article 3 of the [UCC] regulates negotiable instruments, including checks and the check collection process.  Article 4 defines the rights between parties with respect to bank deposits and collections involving banks located in Pennsylvania.") (citation omitted); *Nisenzon v. Morgan Stanley DW, Inc.*, 546 F. Supp. 2d 213, 224 (E.D. Pa. 2008) (stating that "Articles 3 and 4 of the [] UCC govern the collection and payment of the checks."); see also 13 Pa.C.S.A. § 3102 (stating that Article 3 "applies to negotiable instruments."); id. § 4101, cmt. 3 (stating that "Article 4 defines rights between parties with

_____

[6] See 13 Pa.C.S.A. § 3104(f) (under the section specifying what constitutes a negotiable instrument, defining "check," in relevant part, as "a draft, other than a documentary draft, payable on demand and drawn on a bank[.]"); *Pavex, Inc. v. York Fed. Sav. & Loan Ass'n*, 716 A.2d 640, 644 (Pa. Super. 1998) (stating that checks are negotiable instruments); see also 13 Pa.C.S.A. § 3104(a) (defining a negotiable instrument as an unconditional promise to pay a fixed amount of money if it "(1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2) is payable on demand or at a definite time; and (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money....").

respect to bank deposits and collections.").[7]  The subject check, which provided a fixed amount of money payable on demand, did not state any other instruction, and included the indorsement of William H. Duriez, Jr., is a negotiable instrument under the UCC.  Thus, we must examine GJWA's claims

_____

[7] We note that GJWA relies extensively upon Article 4A of the UCC (Fund Transfers), for the proposition that a customer who instructs a bank to make a payment is ordinarily obliged to pay the payment order, unless the bank erroneously executes the payment instructions.  Brief for Appellant at 25-27; see also id. at 27 (arguing that under Article 4A of the UCC, when the bank erroneously executes the payment, the customer is entitled to a refund and interest from the date of the payment).  However, Article 4A of the UCC governs electronic funds transfers, commonly known as wholesale wire transfers.  See 13 Pa.C.S.A. § 4A102, cmt. (stating that "Article 4A governs a specialized method of payment referred to in the Article as a funds transfer but also commonly referred to in the commercial community as a wholesale wire transfer."); Springfield Twp. v. Mellon PSFS Bank, 889 A.2d 1184, 1192 n.10 (Pa. 2005) (stating that "[t]he General Assembly has [] adopted that portion of the UCC[, 13 Pa.C.S.A. § 4A101,] dealing with electronic funds transfers.").  Article 4A reflects "a deliberate decision … to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment."  13 Pa.C.S.A. § 4A102, cmt.; see also id. (noting that Article 4A is "intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article.").  Thus, Article 4A exclusively controls legal issues for fund or wire transfers within its scope, and does not encompass GJWA's claims regarding the misdirected check. See Hospicomm, Inc. v. Fleet Bank, N.A., 338 F. Supp. 2d 578, 586 (E.D. Pa. 2004) (stating that electronic fund transfers were not contemplated by drafters under Articles 3 and 4 because these articles govern check collection and "depend upon bankers looking at particular words and numerals on the face of a particular instrument.") (citation omitted); see also 13 Pa.C.S.A. § 4104 (wherein Article 4, which applies to "items" and defines such term as "[a]n instrument or a promise or order to pay money handled by a bank for collection or payment.  The term does not include a payment order governed by Division 4A (relating to funds transfers) or a credit or debit card slip.").

pursuant to Articles 3 and 4 of the UCC, as they displace the common law causes of action relating to the remedies sought for the misdirected check.[8] See Envtl. Equip. & Serv. Co. v. Wachovia Bank, N.A., 741 F. Supp. 2d 705, 716 (E.D. Pa. 2010) (concluding that "in light of the [UCC's] comprehensive remedial scheme in relation to checks containing alterations or forged indorsements, and in recognition of the likelihood that permitting common law claims here would thwart the purposes of that scheme, [the] negligence, breach of contract, and breach of the duty of good faith and fair dealing claims are displaced."); see also Pavex, Inc., 716 A.2d at 644 (stating that "[a]s part of an attempt to establish uniform rules governing the relationship between banks and their customers, the UCC allocates the losses

_____

[8] To the extent the trial court relied upon AmeriServ's apparent breach of fiduciary duties to reach its conclusion regarding the misdirected check, the UCC displaces such a claim, as GJWA's exclusive remedies for the subject matter is set forth in Articles 3 and 4.  See, e.g., Chelan Cty., Wash. v. Bank of Am. Corp., 2014 WL 3101935, at *5 (E.D. Wash. 2014) (concluding that a breach of fiduciary duties claim was displaced by the UCC where the exclusive remedies for the subject matter at issue (unauthorized transfers) were under Article 4A of the UCC).  Moreover, we note that due to the economic loss doctrine, GJWA could not raise a negligence cause of action as there was no physical or property damage.  See Ellenbogen v. PNC Bank, 731 A.2d 175, 188 n.26 (Pa. Super. 1999) (stating that the economic loss doctrine "bar[s] a plaintiff from recovering purely economic losses suffered as a result of a defendant's negligent or otherwise tortious behavior, absent proof that the defendant's conduct caused actual physical harm to a plaintiff or his property.").  Nevertheless, such a claim would have been displaced by the UCC.

caused by forged [i]ndorsements on negotiable instruments based on the relative responsibilities of the parties to a transaction.") (citation omitted).

Under section 4401 of Article 4 of the UCC, "[a] bank may charge against the account of a customer an item that is properly payable[.] An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank." 13 Pa.C.S.A. § 4401(a). Relevantly, "[a]n item containing a forged drawer's signature or forged indorsement[9] is not properly payable." Id. § 4401, cmt. 1 (footnote added). Thus, the drawee bank is generally liable for a forged check, and must credit

_____

9 While the UCC does not define "forged indorsement," it sets forth an example of a forged indorsement as follows:

> An insurance company draws a check to the order of Sarah Smith in payment of a claim of a policyholder, Sarah Smith, who lives in Alabama. The insurance company also has a policyholder with the same name who lives in Illinois. By mistake, the insurance company mails the check to the Illinois Sarah Smith who indorses the check and obtains payment. Because the payee of the check is the Alabama Sarah Smith, the indorsement by the Illinois Sarah Smith is a forged indorsement.

13 Pa.C.S.A. § 3406, cmt. 3; see also id. § 3204(a) (defining "indorsement"); Forgery, BLACK'S LAW DICTIONARY (8th ed. 2004) (defining forgery, in relevant part, as follows: "1. The act of fraudulently making a false document or altering a real one to be used as if genuine ... 2. A false or altered document made to look genuine by someone with the intent to deceive[.]"); see generally 13 Pa.C.S.A. § 3405(a) (defining fraudulent indorsement, in relevant part, as follows: "In the case of an instrument with respect to which the employer is the issuer, a forged indorsement purporting to be that of the person identified as payee."). Thus, with regard to the plain language of the UCC, a forged indorsement is a signature that is substantially similar to the name of the intended signator or payee such that it is made to look genuine.

the drawer the amount of the check. See id. § 3404, cmt. 3 (stating that "[n]ormally, the loss in forged check cases is on the drawee bank that paid the check."); Pavex, Inc., 716 A.2d at 644 (stating that "[g]enerally, a drawee bank is not entitled to debit the drawer's account when the bank pays over a forged [i]ndorsement[.]"); see also Nisenzon, 546 F. Supp. 2d at 225 (noting that under section 4401, "a drawee may not debit the account of its customer for the amount of a check that the drawee paid over a forged indorsement, because such a check is not properly payable."); id. (stating that "[u]nder the UCC, a bank breaches its agreements with a customer when it pays the holder of a forged check. It is this breach which constitutes the customer's cause of action against a bank to recover the sums paid out on checks bearing forged signatures.").

However, the UCC provides the drawee bank a mechanism to reduce or eliminate its legal responsibility under section 4401, i.e., by demonstrating the drawer's own negligence contributed to the forgery. See 13 Pa.C.S.A. § 3406; see also id., cmt. 4 (stating that "the loss may be allocated between the two parties on a comparative negligence basis."); Pavex, Inc., supra. Specifically, section 3406(a) protects a drawee bank who paid a check against the drawer where the drawee bank proves that (1) its customer, the drawer, did not exercise ordinary care; (2) the drawer's negligence "substantially contributed" to the making of a forged signature; and (3) the drawee/payor bank paid the check in "good faith." 13 Pa.C.S.A. § 3406(a); see also

Nisenzon, 546 F. Supp. 2d at 227 (stating that section 3406(a) "essentially creates a 'conditional estoppel' shielding a bank from liability where a plaintiff's negligence substantially contributes to the forgery.") (citation omitted). In turn, the liability may be allocated on a comparative fault basis if the drawer establishes that the drawee bank failed "to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss." 13 Pa.C.S.A. § 3406(b).

The UCC defines "ordinary care" as follows:

In the case of a person engaged in business, means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this division or Division 4 (relating to bank deposits and collections).

Id. § 3103; see also id., cmt. 4 (noting that the definition of ordinary care applies to Articles 3 and 4). Under the UCC, courts must look at the totality of the circumstances in determining whether a party failed to exercise ordinary care. See id. § 3406, cmt. 1; see also Thompson Maple Prods. v. Citizens Nat'l Bank of Corry, 234 A.2d 32, 36 (Pa. Super. 1967). The "substantially contributes" test is "less stringent than a 'direct and proximate cause' test[,]" and can be established if the party's conduct "is a contributing cause of the alteration or signature and a substantial factor in bringing it about." 13

Pa.C.S.A. § 3406, cmt. 2. Good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Id. § 1201(b)(20).[10]

Here, the payee on the subject check is "DURIEZ EXCAVATING, 121 DURIEZ LN, NORTHERN CAMBRIA PA 15714-1805." William H. Duriez, Jr., indorsed the subject check. Because the indorsement was substantially similar to the name on the payee line on the check (Duriez Excavating), the indorsement was forged. See, e.g., Cont'l Cas. Co. v. Fifth/Third Bank, 418 F. Supp. 2d 964, 975–76 (N.D. Ohio 2006) (concluding that the checks had forged indorsements where the signed indorsements were substantially similar to the designated payee). Thus, the check was not properly payable,

_____

[10] As with "forged indorsement," the UCC does not define "forged signature." Section 3406 clearly states that this term is to be narrowly construed. See id. § 3406, cmt. 2 (stating that the section refers to "forged signature" instead of "unauthorized signature," that was included in a prior section "because it more accurately describes the scope of the provision. Unauthorized signature is a broader concept that includes not only forgery but also the signature of an agent which does not bind the principal under the law of agency."); see also id. § 3403(a) (stating that "[u]nless otherwise provided in this division or Division 4 (relating to bank deposits and collections), an unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value."). But see 13 Pa.C.S.A. § 1201(b)(41) (defining "unauthorized signature" as "[a] signature made without actual, implied or apparent authority. The term includes a forgery."). However, consistent with our review of forged indorsement, a signature is forged where it is similar to the name of the intended payee such that the signature looks to be genuine. See 13 Pa.C.S.A. § 3406, cmt. 3; see also John Hancock Fin. Servs., Inc. v. Old Kent Bank, 346 F.3d 727, 731 (6th Cir. 2003) (defining "forged signature," under a similar statute as section 3406, as a signature "substantially similar to the name of the intended signator such that it appears genuine.") (citation omitted).

and AmeriServ would be liable for the payment of the subject check containing the forged indorsement pursuant to section 4401 of the UCC. See Nisenzon, 546 F. Supp. 2d at 225 (stating that brokerage firm was liable to clients for the payment of checks over forged indorsements).

Nonetheless, the trial court found that both GJWA and AmeriServ were responsible for the misdirection of the subject check and the forged signature, stating the following:

> But for the failure of GJWA to attach the Instructions to Obligee and include the correct "payee" information on its requisitions, such misdirection would not have happened. However, but for [AmeriServ's] failure to follow GJWA's original instructions to fill out checks consistent with the first check executed in this matter, or, at least, seek clarification from GJWA as a result of the attached Pecard email, the misdirection of the check would not have occurred.

Trial Court Opinion, 5/22/17, at 7 (unnumbered). Ostensibly, the trial court found that both parties were equally negligent for the loss associated with the subject check containing the forged signature based upon the failure of each of the parties to exercise ordinary care. In point of fact, the exercise of ordinary care required the parties to review the instructions to guarantee the proper disbursement of the payment. See Nisenzon, 546 F. Supp. 2d at 227 (stating that "only negligence which proximately relates or contributes to the forgery, and not merely to the issuance of the checks, would relieve a collecting bank of liability for improper payment of a fraudulently endorsed check.") (emphasis in original). Upon our review of the competent evidence, we agree with the trial court's finding that both parties were equally negligent

in causing the misdirection of the check and subsequent forgery. See Stephan, 100 A.3d at 664 (noting that we are bound by the trial court's factual findings). Thus, we affirm the trial court's Order dividing the damages, albeit on different legal grounds. See Wilson v. Transp. Ins. Co., 889 A.2d 563, 577 n.4 (Pa. Super. 2005) (noting that "we can affirm the trial court's decision on any valid basis, as long as the court came to the correct result, which in this case was to deny [a]ppellant relief.").

In its final claim, GJWA claims that the trial court erroneously limited its potential recovery to $120,000, the amount set forth in the Consent Judgment in favor of Aegis and against GJWA. Brief for Appellant at 30-31. GJWA contends that the Consent Judgment does not limit AmeriServ's liability. Id. at 31. GJWA argues that under the Settlement Agreement, which led to the entry of the Consent Judgment, it was free to prosecute its cross-claims against AmeriServ. Id. Alternatively, GJWA claims that even if its recovery is limited to $120,000.00, AmeriServ is responsible for the entire amount based upon its breach. Id. at 34-36.

A consent judgment is a contract, and is construed like a contract. Lower Frederick Twp. v. Clemmer, 543 A.2d 502, 510 (Pa. 1988). In interpreting a contract, our standard of review is de novo and our scope of review is plenary. Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc., 98 A.3d 645, 653 (Pa. Super. 2014).

> [W]hen interpreting the language of a contract, th[e]
> Court's goal is to ascertain the intent of the parties and give it

- 24 -

effect. When the words of a contract are clear and unambiguous, the intent of the parties must be ascertained from the language employed in the contract, which shall be given its commonly accepted and plain meaning.

TruServ Corp. v. Morgan's Tool & Supply Co., 39 A.3d 253, 260 (Pa. Super. 2012); see also Habjan v. Habjan, 73 A.3d 630, 640 (Pa. Super. 2013) (stating that courts "must construe the contract only as written and may not modify the plain meaning of the words under the guise of interpretation.").

Here, the Consent Judgment states, in relevant part, the following:

IT IS on this 2nd day of May, 2017, ORDERED AND ADJUDGED that Judgment is entered in favor of [Aegis] and against [GJWA] in the amount of ONE HUNDRED AND TWENTY THOUSAND DOLLARS ($120,000.00), plus post[-]judgment interest at the legal rate from the date of this judgment until paid in full and in good funds, and it is further ordered that execution shall issue therefore;

IT IS FUTHER ORDERED, ADJUDGED AND AGREED that [GJWA] waives any right to appeal this Consent Judgment and agrees that this Consent Judgment is final and non-appealable….

Consent Judgment, 5/2/17 (capitalization in original).

Here, GJWA knowingly and voluntarily agreed to limit the damages owed to Aegis to $120,000.00. Further, the plain language of the Consent Judgment unequivocally and clearly states that the judgment in the amount of $120,000.00 was final. While the Consent Judgment did not limit GJWA's ability to file claims arising out of these damages against AmeriServ, we decline to modify the amount of damages agreed to by the parties in the Consent Judgment. See Cioffi v. Cioffi, 885 A.2d 45, 48 (Pa. Super. 2005)

(stating that "[a] court may construe or interpret a consent decree as it would a contract, but it has neither the power nor the authority to modify or vary the decree unless there has been fraud, accident or mistake.") (citation omitted); see also Karkaria v. Karkaria, 592 A.2d 64, 71 (Pa. Super. 1991) (noting that "[a] party who has acquiesced in an order or judgment will not later be heard to challenge it."). Because we cannot construe the Consent Judgment as anything but clear on its face, we conclude that the damages were limited to $120,000, to be properly apportioned between GJWA and AmeriServ, and that GJWA's self-serving attempt to increase the damages is without merit.

Judgment affirmed.

Judge Dubow joins the memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/12/2019